IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

PETER KRYL,                              )
                                         )
            Plaintiff,                    )      TC-MD 110444C
                                         )
      v.                                 )
                                         )
LANE COUNTY ASSESSOR,                    )
                                         )
            Defendant.                    )      **DECISION**

Plaintiff appeals the real market value (RMV) of commercial property identified as Accounts 0479731, 0479723, and 0479749 (subject properties) for the 2010-11 tax year. Trial was held by telephone on January 18, 2012. Peter Kryl (Kryl) appeared and testified on his own behalf. David W. Sohm, Lane County Registered Appraiser 3, appeared and testified on behalf of Defendant. The court received and admitted without objection Plaintiff's Exhibits A-D and Defendant's Exhibit A.

## I. STATEMENT OF FACTS

Plaintiff purchased the subject properties on August 19, 2010, for $450,000. (Ptf's Ex D at 18; Def's Ex A at 1.) The combined RMV found by the Lane County Board of Property Tax Appeals was $726,929; the combined maximum assessed value (MAV) and assessed value (AV) was $510,343 (Ptf's Compl at 2-4.) The subject properties are three connected buildings located on a 15,800 square foot parcel zoned "I-2, Light-Medium Industrial" on the corner of West 7th Avenue and Garfield Street in Eugene, Oregon. (Def's Ex A at 2-3.) At the time of trial, the subject properties were leased by AAMCO Transmission Repair Business (AAMCO), the tenant for at least the previous 10 years. (Ptf's Ex A at 1, Ex D at 19; Ptf's Ltr at 2, Dec 20, 2011.)

/ / /

The total area of the three buildings is 10,393 square-feet on the ground floors, plus additional mezzanine and loft storage space in Buildings 1 and 3. (Def's Ex A at 3; *See* Ptf's Ex A at 1.) Building 1 was built in 1966 and has 4,833 square-feet, plus the mezzanine storage space. (Def's Ex A at 3.) Building 1 contains 627 square-feet of office space and has six in-ground floor hoists for automotive repair use. (*Id.*) Building 2 is between Building 1 and Building 3 and was built in 1962. (*Id.*) It has 2,600 square-feet and contains service bays and storage areas for the tenant of Building 1. (*Id.*) Building 3 is the oldest building, constructed in 1961. (*Id.*) It has 2,960 square-feet, which includes ground-floor and mezzanine-level office space, as well as open-loft storage space. (*Id.*) It also has two double-pole hoists for automotive repair use. (*Id.*) There is 952 square-feet of covered, fenced storage area behind Buildings 1 and 2. (Def's Ex A at 3.) There is asphalt and concrete paving for parking, but Kryl testified that parking is very limited. (*See* Ptf's Ex A at 1; Def's Ex A at 3.) Defendant stated that the parking "has been adequate for the tenant for over 10 years." (Def's Ex A at 3.)

All three buildings are average quality construction and have concrete slab floors, exposed block walls, and exposed roof trusses. (Def's Ex A at 3.) Kryl testified that the condition of the subject properties is "fair"; Building 1's furnace is "old," all of the garage doors need to be replaced, and the shared roof needs repair or replacement. (*See* Ptf's Ex A at 1, Ex D at 19.)

The subject properties are located in a high traffic area, with 35,600 vehicles traveling along Garfield Street per day and 26,900 vehicles traveling along 7th Avenue per day. (Def's Ex A at 2; *See* Ptf's Ex A at 2.) The neighborhood is made up of restaurants, retailers, and other service shops. (Def's Ex A at 2.)

/ / /

At the time of trial, the subject properties were leased by AAMCO, an automotive service and repair shop. (Ptf's Ex A at 1, Ex D at 19; Ptf's Ltr at 2, Dec 20, 2011.) AAMCO sub-leases one building to another auto repair business.[1] (Def's Ex A at 22.) The current arrangement between Plaintiff and AAMCO is a five-year, modified gross lease expiring June 30, 2012. (Ptf's Ex A at 1, Ex D at 19.) Kryl testified that he is responsible for property taxes, insurance, and building repairs, and AAMCO is responsible for paying utilities and maintaining the equipment. (*See* Ptf's Ex A at 2, Ex D at 18-19.) By its terms, the lease requires payment of $4,200 per month, or $0.40 per square-foot per month (rounded). (Ptf's Ex A at 2, Ex D at 19.) However, at the time Kryl purchased the subject properties, the previous owner and AAMCO had a modified arrangement; the rent was lowered to $3,500 per month for a period of six months because AAMCO was experiencing "tough economic times." (Ptf's Ex A at 2.) This modified arrangement ended August 31, 2010. (*Id.*) Kryl testified that AAMCO was still experiencing economic difficulty, as evidenced by the fact that AAMCO was six weeks behind on rent at the time of trial. (*See* Ptf's Ex B (copy of check from AAMCO to Kryl dated Dec 7, 2011, in the amount of $2,100, a partial payment of November's rent); Ptf's Ltr at 1, Dec 20, 2011.)

A.     *Plaintiff's RMV evidence*

Plaintiff used the sales comparison approach and the income approach to support his requested RMV of $450,000. Plaintiff's sale comparable is a 12,300 square-foot building in Eugene on a 30,056 square-foot paved, fenced lot zoned "Community Commercial." (Ptf's Ex C.) The building was built in 2000, constructed of steel, and completely insulated. (*Id.*) The sale comparable sold for $650,000 on March 30, 2011. (*Id.*) Kryl testified that the sale

_____

[1] "Building 3 is subleased for $1,700 per month with the tenant paying for utilities and garbage collection. The sublease amounts to $0.57 per square foot per month." (Def's Ex A at 14.)

DECISION  TC-MD 110444C                                                                                          3

comparable is superior to the subject properties because it is newer and has better parking, although Kryl did not make any adjustments to the comparable's March 2011 sale price.

Using a type of income approach, Plaintiff determined that $0.40 per square-foot per month is the fair market value rent. (Ptf's Ltr at 2, Dec 20, 2011.) Lease Comparable 1 is a listing for a 11,284 square-foot building in Eugene on a 1.6 acre enclosed gravel lot. (Ptf's Ex D at 1.) The listing advertises 8,990 square-feet of industrial-use space, 2,294 square-feet of office space, and 1,440 square-feet of storage space for a price of $0.40 per square-foot per month, modified gross. (*Id.*) Kryl testified that he gave the most weight to Lease Comparable 1. (*See* Ptf's Ltr at 2, Dec 20, 2011; Ptf's Ex D at 3.) Lease Comparable 2 is a 20,500 square-foot building next to the subject properties. (*Id.* at 2.) The building is on a 40,000 square-foot lot, zoned Community Commercial, and is leased for $0.32 per square-foot per month, triple net. (*Id.*) Kryl acknowledged that when the triple net aspect is factored in, the effective rent for Lease Comparable 2 is $0.40 per square-foot per month.

Plaintiff also presented a table, titled "Industrial Comps" and dated May 2, 2011, that lists lease prices for various properties in the Eugene area. (Ptf's Ex D at 3.) Kryl testified that this table was completed by a realtor for Kryl's research purposes when he was looking to invest in a different property. The properties range from a 6,140 square-foot metal building with a $0.40 per square-foot per month industrial gross lease, to a 11,125[2] square-foot metal building on a one-acre fenced lot for $0.35 per square-foot per month. (*Id.*) Kryl acknowledged that the sale and lease comparables may not be suited for automotive business use, and are, in fact, industrial warehouses in areas without the same stream of traffic as the subject properties. Kryl also

/ / /

---

[2] The largest building on the list was the 11,284 square-foot Sale Comparable 1, listed for $0.40 per square foot per month. (Ptf's Ex C, D at 3.)

testified that the subject properties could be leased by users other than automotive businesses, such as distribution centers or storage facilities.

Plaintiff provided 34 other listings as lease comparables. (Ptf's Ex D at 4-16.) Those lease listings range from a 1,338 square-foot office suite renting for $0.50 per square-foot per month, triple net, to a 140,000 square-foot heavy industrial manufacturing space renting for $0.27 per square-foot per month, triple net. (Ptf's Ex D at 8-9.)

Plaintiff also provided a letter from Dennis C. Johnston (Johnston), Broker, dated December 10, 2011, offering an opinion of value for the subject properties based on an income approach. (Ptf's Ex A.) Johnston used the actual $4,200 lease rate to calculate gross income, concluding a gross scheduled income of $50,400 for the subject properties. (*Id.* at 2.) Johnston subtracted a vacancy and credit loss of $3,780 for an effective "gross operating income" of $46,620. (*Id.*) Using estimated operating expenses (including property taxes) of $13,986, Johnston calculated a net operating income (NOI) of $32,634. (*Id.*) Johnston's estimated "current" market capitalization rate of 7.5 percent yielded an RMV estimate of $435,120 for the subject properties. (*Id.*) Johnston's letter does not indicate an opinion of value as of the January 1, 2010, assessment date.

B.      *Defendant's RMV evidence*

Defendant considered all three approaches to value, but concluded that only the sales comparison and income approaches were applicable to the subject properties. (Def's Ex A at 7.) Using the sales comparison approach, Defendant concluded a land value of $237,000, $511, 000 for the buildings, and $748,000 (rounded) total. (Def's Ex A at 1, 8, 14.)

Defendant used three sales to determine land value. (*Id.* at 8.) Land Sale 3 sold on May 17, 2006, for an adjusted sale price of $180,000 ($19.27 per square-foot) and set the upper

limit of value due to the motivation of the buyer. (*Id.* at 8, 21) Land Sales 1 and 2, with adjusted sale prices of $122,500 ($7.47 per square-foot) and $275,000 ($8.31 per square-foot), respectively, were low indicators of value because their traffic exposure was lower than that of the subject properties and because of "other limitations." (*Id.* at 8, 19-20.) Land Sale 1 sold on May 5, 2009, and Land Sale 2 sold on June 11, 2008. (*Id.*)

Defendant selected four sales of automotive repair buildings to determine the value using the sales comparison approach. (Def's Ex A at 9-14.) Sale 1 is a 9,800 square-foot concrete block building, built in 1965, and sold in December 2010 for an adjusted sale price of $680,000 ($69.39 per square-foot). (Def's Ex A at 9, 13.) Defendant states that Sale 1 is at the lower range of the market because it "has no traffic exposure." (*Id.* at 13.) Sale 2 is a 8,750 square-foot metal building, built in 1997, and sold in November 2008 for an adjusted sale price of $650,000 ($74.29 per square-foot). (*Id.* at 10, 13.) Defendant noted that Sale 2 is much newer than the subject properties, has more finished office and parts space, and has excellent traffic exposure. (*Id.* at 13.) Defendant concluded that the price of Sale 2 is higher than would be appropriate for the subject properties even though Sale 2 is encumbered by a flood plain and drainage channel. (*Id.* at 13.) Sale 3 is a 9,442 square-foot concrete block building, built in 1946, and sold in April 2011 for an adjusted sale price of $870,000 ($92.14 per square-foot). (*Id.* at 11, 13.) Defendant reported that the condition of Sale 3 was inferior to the subject properties at the time of the sale, but the sale price is higher than the subject properties could command because Sale 3 is in a superior location. (*Id.* at 13.) Sale 4 is a 2,244 square-foot concrete block building, built in 1972, and sold in August 2007 for an adjusted sale price of $300,000 ($133.69 per square-foot). (*Id.* at 12-14.) Defendant concluded that Sale 4 is at the top of the range because of its small

/ / /

size. (*Id*. at 14.) Defendant determined a RMV between Sale 1 and Sale 2, concluding a value of $748,000 (rounded) ($72 per ground-floor square-foot) for the subject properties. (*Id*. at 14.)

Using the income approach, Defendant determined that $0.60 per square-foot per month is the fair market value rent. (Def's Ex A at 15.) Defendant used four Eugene-area lease comparables in its income projection. (*Id*. at 14-15.) The lease comparables range from a 2,345 square-foot area built in 1974 renting for $0.68 per square-foot per month, triple net, to a 4,360 square-foot area built in 1957 renting for $1.02 per square-foot per month, triple net. (*Id*.) Defendant acknowledged that all of the lease comparables are significantly smaller than the subject properties. Defendant states that "[a]ll of the lease comparables reflect much higher rent than the subject property contract can rent[,]" and that "the subject buildings are leased at rates lower than the general market." (*Id*. at 15.) Defendant concluded that the fair market value rent for the subject properties for the 2011-12 tax year is $0.60 per square foot per month. (*Id*.)

Using an estimated market rent of $0.60 per square-foot per month, Defendant calculated an annual potential gross income of $74,830. (*Id*.) Defendant then subtracted projected vacancy and credit loss, resulting in an effective gross income of $71,089 (rounded). (*Id*. at 16.) To calculate Plaintiff's operating expenses, Defendant used actual building insurance costs, but estimated building maintenance and management costs, resulting in a projected NOI before property taxes of $63,738. (*Id*.)

To determine the capitalization rate, Defendant used the four sales comparables discussed above. (*Id*. at 17; *see id*. at 13-14.) Defendant reports the capitalization rates as follows: Sale 1 – 7.02 percent; Sale 2 – 7.29 percent; Sale 3 – 5.28 percent; Sale 4 – 6.91 percent. (*Id*. at 13, 17.) Defendant believes the capitalization rates for all of the sales are too low, giving the following reasons: the Sale 1 rate is low "due to the motivation of the buyer"; the rate for Sale 2 is also

low because the market conditions at the time of the sale (2008) did "not reflect the impact of the recession"; Sale 3's rate is far too low because it contains an "old house and excess land"; and the rate for Sale 4 is too low because the sale "is quite dated" (2007). (*Id.* at 17.) Defendant substituted the 2007 sale price for Sale 4 ($300,000) with its January 2011 listing price ($249,000), concluding an indicated overall capitalization rate for Sale 4 of 8.3 percent. (*Id.* at 13-14, 17.) Defendant concluded that an overall rate of eight percent (excluding taxes) was appropriate for the subject because of "age, condition, size, and parking * * * ." (*Id*. at 17.) Defendant then calculated the effective tax rate to be one percent, resulting in an overall rate of nine percent for the subject properties as of January 1, 2010. (*Id.*) Defendant then applied the nine percent overall capitalization rate to the NOI of $63,738, and arrived at an estimated value of $708,000 (rounded) for the subject properties for the 2010-11 tax year. (*Id.*)

Using the sales comparison approach, Plaintiff determined a RMV for the subject properties of $450,000 for the 2010-11 tax year. (Ptf's Compl at 1; Ptf's Ltr at 1, Dec 20, 2011.) Under the income approach, Plaintiff determined that $0.40 per square-foot is the fair market value rent. (Ptf's Ltr at 2, Dec 20, 2011.) Plaintiff's broker used that figure and arrived at a value estimate under the income approach of $435,120. (Ptf's Ex A at 2.) Under the sales comparison approach, Defendant determined a value of $748,000 (rounded) using land and building sales comparables. (Def's Ex A at 14.) Under the income approach, Defendant determined that $0.60 per square-foot is the fair market value rent. (*Id*. at 13.) Under the income approach, Defendant's figures indicated a value of $708,000 (rounded). (*Id*. at 17.) Upon reconciliation, Defendant determined that the RMV for the subject properties was $748,000 for the 2010-11 tax year. (*Id*. at 18.) Plaintiff asserts that his August 2010 purchase price of $450,000 is the best indicator of value as of the assessment date because it was a result of an

arm's-length transaction; whereas the Defendant argues that the purchase price was deflated due to the tenant's economic difficulties and the fact that the seller was an estate. (*See* Ptf's Ltr at 1, Dec 20, 2011; Def's Ex A at 1.)

## II. ANALYSIS

The issue before the court is the RMV of the subject properties for the 2010-11 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v Clackamas County Assessor*, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)).

ORS 308.205(1) defines RMV in part as:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." [3]

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210. "Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence." *CLP Elements v. Benton County Assessor* (*CLP Elements 2*), TC-MD No 110559N at 17 (Mar 22, 2012) (citing ORS 305.412). This court has previously ruled that "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971) (citation omitted).

There are three standard methods of valuation in determining RMV, as prescribed by statute and administrative rule. ORS 308.205(2) states that "[r]eal market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." The accompanying rule describes the following three methods of valuation:

---

[3] All references to the Oregon Revised Statutes (ORS) are to 2009.

(1) the cost approach, (2) the sales comparison approach, and (3) the income approach.

OAR 150-308.205-(A)(2)(a);[4] *See also Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). "The

approach of valuation to be used is a question of fact to be determined on the record." *CLP*

*Elements 2*, TC-MD No 110559N at 17 (citation omitted). One is not required to use all three

approaches, but "each must be investigated for its merit * * * ." OAR 150-305.205-(A)(2)(a).

Neither party utilized the cost approach because of the age of the subject properties, but both

parties utilized the income and sales comparison approaches.

Finally, "the court has jurisdiction to determine the real market value or correct valuation

on the basis of the evidence before the court, without regard to the values pleaded by the

parties." ORS 305.412.

A.      *Sales comparison approach*

"Under the [sales comparison] approach, the value of a property is derived by comparing

the subject property with similar properties[.]" *Reedway Place, Inc. v. Multnomah County*

*Assessor*, TC-MD No 100597B at 5 (Jun 10, 2011) (internal quotations marks and citation

omitted). In order to determine the RMV of a subject property under the sales comparison

approach, "[t]he court looks for arm's length sale transactions of property similar in size, quality,

age and location * * * ." *Id*. (internal quotations marks and citation omitted). Then,

"adjustments are made for any differences * * * ." *Id.* (internal quotations marks and citation

omitted). "All transactions utilized in the sales comparison approach must be verified to ensure

they reflect arms-length market transactions." OAR 150-308.205-(A)(2)(c).

Plaintiff submitted one sale for comparison, which sold on March 30, 2011, for $650,000

($52.85 per square-foot). Plaintiff contends that this property is far superior to the subject

_____

[4] All references to the Oregon Administrative Rules (OAR) are to 2009.

properties, and that the sale price "would have to be adjusted for the age, square footage, condition, zoning, and parking." (Ptf's Ltr at 2, Dec 20, 2011.) However, Plaintiff did not suggest adjustment amounts for those differences.

Defendant submitted four sales for comparison, but calculated adjustments for only two. Sale 1 was adjusted downward by $150,000 due to the motivation of the buyer, resulting in a price of $680,000 ($69.39 per square-foot). (Def's Ex A at 9, 13.) Sale 3 was adjusted downward by $90,000 for personal property included in the transaction, resulting in a price of $870,000. (*Id.* at 11, 13.) Defendant did not calculate adjustments for "size, quality, age, or location," but made conclusions about whether the subject properties would command a "higher" or "lower" sale price in comparison. Defendant relied most heavily on Sales 1 and 2, concluding a value of $748,000 (rounded) ($72 per square-foot) for the subject properties, reasoning that they would command a higher price than Sale 1 due higher traffic exposure. (Def's Ex A at 13-14.)

Notwithstanding the fact that Defendant's Sale 1 occurred nearly one year after the applicable assessment date in this case, the court concludes that Defendant's Sale 1 is the best property for comparison. Sale 1 is similar to the subject properties in "size, quality, age, [and] location * * * ." The court finds the $150,000 downward adjustment to Sale 1 to be reasonable. The court acknowledges that the subject properties experience more traffic exposure than Sale 1 and that the shared roof needed repair as of the assessment date. The court concludes that those differences offset, requiring no further adjustments. Under the sales comparison approach, the combined RMV of the subject properties is $680,000.

/ / /

/ / /

B.      *Income approach*

"The income [approach] relies on the assumption that a willing investor will purchase a

property for an amount that reflects the future income stream it produces." *CLP Elements 2*,

TC-MD No 110559N at 18 (internal quotation marks and citation omitted).  Under the income

approach, a property's value is calculated through the direct capitalization method, which

"focuses on two key components: (1) the capitalization rate * * * and (2) [NOI.]" *Id.* (internal

quotation marks and citation omitted).  "A cap[italization] rate is generally calculated using

market sales." *Id.* (internal quotation marks and citation omitted).  Proper calculation of the

capitalization rate is of paramount importance, as "[s]light deviations in cap[italization] rates

profoundly change the estimated value of a property[.]" *Id.* (internal quotation marks and

citation omitted).  "NOI is the currently expected net income of a property after all operating

expenses are deducted from gross income." *Id.* (internal quotation marks and citation omitted).

This court has previously stated that NOI is calculated using "historical gross income and

expenses for the subject [property], adjusted by reference to market data." *Id.* (citing *Allen v.

Dept. of Rev.*, 17 OTR 248, 254 (2003)).  The objective is to estimate value using relevant

market indicators.

The Department of Revenue's administrative rule, OAR 105-308.205-(A)(2)(g), states,

"The income to be used in the income approach must be the economic rent that
the property would most probably command in the open market as indicated by
current rents being paid, and asked, for comparable space.  Income from the
operation of the property may be utilized for property types, such as industrial
plants that are not typically leased or rented."

As of the January 1, 2010, assessment date, AAMCO was paying $4,200 per month

($0.40 per square-foot per month).[5]  (Ptf's Ex A at 2.)  AAMCO sublets one of the three

---

[5] From March to August 2010, AAMCO was paying $3,500 per month ($0.34 per square-foot per month)
in a special arrangement because of economic difficulties.  (Ptf's Ex A at 2.)  In September 2010, the rent returned

buildings for $1,700 per month, or $0.57 per square-foot. (Def's Ex A at 14.) Plaintiff presented a table of "Industrial Comps" with lease prices ranging from $0.54 to $0.32 per square-foot per month, plus a list of 34 other lease prices. (Ptf's Ex D at 3-16.) Plaintiff's only calculations of value were based on the $4,200 contract lease price and Johnston's unsubstantiated "current" estimates. (Ptf's Ltr, Dec 20, 2011; Ptf's Ex A.) Defendant used the lease prices of the same properties in its sales comparison approach. (Def's Ex A at 14-15.) Defendant noted that all of the lease prices were higher than the lease price of the subject properties; Defendant was unable to find lease price comparables of the same size or with the same parking limitations. (*Id*. at 15.) Defendant concluded an estimated rent of $0.60 per square-foot per month for the subject properties. (*Id*.) Using this estimated rent and estimated expenses (except for insurance costs), Defendant calculated NOI. (*Id*. at 16.) Defendant then used a capitalization rate derived from Sales 1 through 3 and the listing price of Sale 4. (*Id*. at 17.) The parties' figures for vacancy and credit loss are similar, but they disagree as to the market rent, expense calculations, and the appropriate capitalization rate.

The court concludes that Plaintiff's contract lease rent is the best evidence of the market rent in this case. The court disregards Johnston's figures as unsubstantiated and irrelevant to the assessment date. The court accepts Defendant's five percent vacancy and credit loss figure (applied to the court's potential gross income), and Defendant's total expenses, which include $953 for insurance, a five percent deduction for maintenance ($2,394), and a four percent deduction for management ($1,915.20). The total expenses come to $5,262.20. Using those figures, the court finds the NOI to be $42,617.80. The court finds that Defendant's Sale 1 is the

---

to the contract price of $4,200 ($0.40 per square-foot per month). (*Id*.)

best evidence of capitalization rate; therefore, a capitalization rate of 8.25 percent applies.[6]

These figures yield a value estimate of $516,579 (rounded).[7]

C.    *Purchase price*

Plaintiff urged the court to consider his August 19, 2010, purchase price of $450,000 as credible evidence of the value of the subject properties. "The sale price of a recent, voluntary, arm's-length sale of property 'between a willing buyer and seller, both of whom are knowledgeable,' although not 'conclusive, is very persuasive of market value[.]' " *CLP Elements v. Benton County Assessor* (*CLP Elements 1*), TC-MD No 100662D at 10 (May 10, 2011) (citing *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973). "[W]hether the sale was 'recent' and whether it was 'arm's-length' " are two important considerations. *Id.* Defendant questioned whether Plaintiff's purchase was at arm's-length because the transaction was an estate sale. The court concludes that Plaintiff's purchase price is afforded some weight, but is not "very persuasive," as the sale was from an estate and occurred over seven months after the assessment date. *See Roder Holdings LLC v. Deschutes County Assessor*, TC-MD No 100511B at 4 (Apr 11, 2011) (sale closing nine months after the assessment date was not "recent"); *Roeder v. Deschutes County Assessor*, TC-MD No 100487B at 2 (Apr 11, 2011) (sale closing seven months after the assessment date was not "recent"); *CLP Elements 1*, TC-MD No 100662D at 10 (purchase of the subject property four to six months after the assessment date was "close").

/ / /

/ / /

---

[6] 7.25 plus one percent for property taxes yields a pre-property tax capitalization rate of 8.25 percent.

[7] $4,200 x 12 = $50,400 gross income. $50,400 - $2,520 = $47,880 effective gross income. $47,880 - $5,262.20 = $42,617.80 NOI. $42,617.80/0.0825 = $516,579 (rounded).

## III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that Plaintiff established, by a preponderance of the evidence, that a reduction in the 2010-11 RMV is warranted. The court places most weight on the income approach because of the volume of market data presented and the existence of actual verified rents. As stated above, the court places some weight on Plaintiff's purchase price. The sales comparison approach has little weight, as the court finds that Plaintiff's property is unique. Considering the evidence as a whole, the court concludes that the combined RMV of the subject properties was $500,000 for the 2010-11 tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2010-11 RMV of property identified as Accounts 0479731, 0479723, and 0479749 is $500,000.

Dated this ___ day of June 2012.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on June 21, 2012. The Court filed and entered this document on June 21, 2012.*